JOHN DALE MCGILL et al., complainants,

*v.*

THE TRUST COMPANY OF NEW JERSEY et al., defendants.

[Decided May 15th, 1923.]

1. Where provisions in a will for the disposition of a certain part of testator's estate are replaced by substitutionary provisions in a codicil, the invalidity of some or all of the codicil's provisions will not revive the provisions in the will, in the absence of direction by testator.

2. Where a will is amended by a codicil, the provisions of the will remain effective except to the extent necessary for them to give way in order to give effect to the provisions of the codicil.

3. Where testator gives the income of a trust fund to his son for life, thereafter to any children the son leaves him surviving, and the *corpus* to such of those children as and when they attain twenty-five years of age, and in case none attains twenty-five, then to testator's "heirs of blood," both of the alternate gifts of *corpus* contravene the rule against perpetuities and are void.

4. Where testator gives successive interests in a trust fund to several beneficiaries, and the ultimate gift of *corpus* is void under the rule against perpetuities, the prior gifts will not be invalid if they do not themselves contravene the rule against perpetuities, unless they are so inseparably interwoven with the invalid gift as necessarily to fall with it, or unless merely incidental to and in aid of the main invalid gift.

5. Testator gave his residuary estate to a trustee to pay the income from one share to testator's son for life, and thereafter to use such income for the support and education of any children left by the son, exclusively, until they attained twenty-five years of age, and then to give them the principal; but if none attained twenty-five, to give the principal to testator's heirs of blood. The son and three infant children of the son survived testator. *Held*—(1) the alternate gifts of *corpus* are both void under the rule against perpetuities; (2) the equitable life estate to the son is good; (3) the son's children take a vested life estate, subject to their father's life estate, and subject to being divested in whole or in part by predeceasing their father or by the birth of other children; (4) the *corpus* passes by resulting trust to testator's heirs-at-law and next of kin, subject to the preceding life estates.

6. Contingent beneficiaries under a testamentary trust are entitled to the aid of equity to protect their contingent interests, if the contingency be not too remote.

7. Where there are several separable and distinct issues in a cause, final decrees upon one or more of such issues may be entered separately.

On final hearing.

*Messrs. Smith, Mabon & Herr,* for the complainants.

*Messrs. Besson, Alexander & Stevens,* and *Messrs. Fisk & Fisk,* for the defendant Trust Company of New Jersey.

*Mr. Merritt Lane,* for the counter-claimant Alexander T. McGill.

*Messrs. Osborne, Cornish & Sheck,* and *Mr. Thomas Fleming Walsh* (of the New York bar), for counter-claimant Eleanor A. Mayer.

BUCHANAN, V. C.

Dr. John Dale McGill died November 28th, 1912, leaving a will and a codicil thereto, both duly probated in Hudson county, under the provisions of which the Trust Company of New Jersey was made executor and also trustee. It assumed the duties of executor and trustee and has since been acting as such.

The testamentary design, as expressed by the codicil, was broadly, that the income from the estate should be paid to his two children, Alexander and Eleanor (now Mrs. Mayer), during their lives, and at their deaths to their children—the *corpus* to go to such children of Alexander and Eleanor as should attain twenty-five years of age, upon their reaching that age. Eleanor has so far had no children; her brother has three—John, Alexander and Charles, all infants of tender years, and all *in esse* at testator's death.

The original bill of complaint was filed by these three grandchildren of testator (by their mother, as next friend), alleging divers improper acts and omissions by the trustee, resulting in loss to complainants, and praying the removal of the trustee and an accounting from it, together with reimbursement of the alleged losses. Generally speaking, the misconduct alleged consists of disbursements out of, or charges against, *corpus,* which complainants assert should not have been made at all, or should have been charged against income instead of *corpus.*

The trustee's answer denies some of the acts alleged, denies the impropriety of the charges against *corpus,* sets up matter in confession and avoidance and pleads *res' adjudicata.*

The trustee concedes, and indeed desires, that which all the other parties ask—that jurisdiction of the whole matter of the trust estate and its administration be taken over by this court from the orphans court (where one or two accountings have been previously had). I am satisfied that this is a case where that should be done. Issues are raised which can, of course, be determined only in this court, and a consideration of the divers matters involved makes it evident that equity will best be served by taking over jurisdiction *in toto.*

Testator's daughter Eleanor, one of the life tenants, by her answer, admits most of the allegations of fact, but denies that any charges were made against *corpus* which should have been made against income, and denies that complainants have any interest in the estate. She proceeds with a counter-claim,

setting up that her father's attempted testamentary disposition, so far as concerns those provisions dealing with the gifts subsequent to the life estates to his own two children (Alexander and Eleanor), is void; that neither her own possible children, nor Alexander's present or possible future children, nor anyone else, has any valid interest under the will and codicil; that she and Alexander have vested estates in remainder in the *corpus,* subject only to their own respective life estates; and that hence they are entitled to have the whole estate paid over to them immediately; and prays an interpretation of the will and a decree accordingly. She also makes allegations against the trustee as to its conduct and prays relief in that behalf, somewhat similarly to complainants. These should have been set up, in form, as a separate cause of action or counterclaim, since clearly the cause of action against the trustee in this behalf is entirely separate and distinct from the cause of action to establish her right to a remainder in one-half the *corpus. Chancery Rule 59; Cf. Steerman* v. *Snow, 118 Atl. Rep. 696.* The parties have all answered, however, and amendments in that behalf, if necessary, may be made; and will for present purposes be deemed to have been made.

Testator's son Alexander, the other life tenant (and the father of complainants), filed an answer similar to that of his sister. He also filed a counter-claim against the trustee, including in his allegations a charge that the trustee wrongfully refuses to pay him any income since the commencement of this suit. To the counter-claim of his sister he files an answer submitting to the jurisdiction and determination of the court.

The trustee, by its answer to the counter-claim of Alexander, admits the refusal to pay income to Alexander since the commencement of this suit, and claims in justification thereof, the right so to do in order to be able to reimburse itself in the event that it be finally determined that it has made disbursements out of *corpus* which should have been made out of income.

I. HAVE COMPLAINANTS ANY INTEREST IN THE TRUST ESTATE?

Testator was domiciled at his death (and for many years prior thereto) in New Jersey, and it is not controverted that the validity and effect of his testamentary provisions are to be determined by the law of this state.

There are only four ways in which complainants could have acquired an interest in testator's estate: (1) by direct testamentary gift; (2) by intestacy; (3) by resulting trust; (4) by assignment or transmission from someone taking under one of the three prior ways. No proof or claim is made that complainants have acquired any interest in this last manner; and they cannot have acquired anything by intestacy or resulting trust, since Alexander and Eleanor are and were at testator's death his only heirs-at-law and next of kin.

Examination of the will and codicil shows that there are no provisions under which gifts can be deemed to have been made to complainants except that part of the will which disposes of the equitable interests in the residuary estate given to the trustee, and that part of the codicil which does likewise.

The provisions of the will purport to make a general and complete disposition of the equitable interests in the residuary estate to and among testator's descendants according to varying circumstances. The codicil purports to make such a general and complete disposition among testator's descendants; but the plan or scheme of the will in this behalf is entirely different from the plan or scheme of the codicil. The latter does not contain mere amendments to the former; it is an entire substitute therefor.

Where provisions of the codicil "conflict or differ from the provisions of said will, the said provisions of the codicil shall be effective and the provisions of the will which they change and abrogate shall be null and void and of no effect whatever." This by testator's express direction in the codicil, and as well also by operation of law. It is entirely clear upon examination and comparison, that the dispositions in the will were in-

tended to be, and are, revoked by the dispositions in the codicil of the same subject-matter and among the same beneficiaries.

Being thus revoked they are definitely and finally nonexistent as operative testamentary provisions, just as much so as if testator had physically destroyed them, no matter whether or not the codicil's substituted provisions, or any part thereof, be held invalid. Doubtless testator might validly have provided in the codicil that if the latter were held invalid the will's provisions should be thereby revived, but he has not done so. We cannot interpolate such a provision, even though we may believe that testator would have done so if he had contemplated the possibility of the invalidity of the provisions of the codicil. The function of the court is only to construe the will that testator has made—not to make a will for him. The situation is in nowise analogous to the revival of a will by the revocation of a revoking codicil, or by the failure of probate of a revoking codicil because of defective execution or proof. Where the revoking codicil fails of probate there is nothing to revoke the will; where the revoking codicil is itself revoked, it evidences the second change of intention by testator, and his final intent that the original will shall stand unchanged; but where the codicil is not revoked and is probated, but some or all of its provisions are held invalid, there is nothing to show that testator's intent is to revive the provisions in the original will. Obviously he did not contemplate the invalidity of the codicil's provisions or of any of them; he has made no direction to take effect in such contingency, and no one else can do so.

We pass, then, to a more detailed consideration of the codicil to ascertain if complainants have any interest under the provisions thereof.

A codicil being not a complete new will but an amendment to the original instrument, the provisions of the latter remain effective except to the extent necessary for them to give way in order to give effect to the new provisions of the codicil. *Den* v. *Snowhill, 23 N. J. Law 447* (at *p. 454; Lyon* v. *Clawson, 56 N. J. Eq. 642; affirmed, 58 N. J. Eq. 584; Thomas* v.

*Scheible, 91 N. J. Eq. 452.* That such was testator's intent is shown by his language at the beginning of the codicil. By this codicil, then, testator continues the gift of residuary estate to the executor in trust, but makes different directions as to the disposition of income and *corpus* of the trust estate, so far as Eleanor and Alexander and their issue are concerned. Briefly stated, the codicil conceives of the trust fund in two undivided parts, which we may call "Alexander's share" and "Eleanor's share." These were to be respectively two-fifths and three-fifths, but if Eleanor should remarry, were to be one-half and one-half. By a specific condition, if she should live again with William B. Carr (who was her husband at the date of the codicil, but from whom she had already separated) she would receive only an annuity of $1,200. As to "Alexander's share," the net income therefrom is to be paid to him for life, then used for the education and support of such children as he may leave, until they arrive at twenty-five years of age, at which time the *corpus* is to be paid to them; if no child of his reaches twenty-five years, the *corpus* goes to testator's heirs of blood." There are similar provisions as to "Eleanor's share," except any children Eleanor might have by Carr are excluded, and she is given a power of appointment by will, over the *corpus* of "her share," to or among any of testator's blood relations, preferably his immediate descendants.

Of these nine gifts made, or attempted to be made, by the codicil, we may at once exclude four; complainants, Alexander's children, could not take an interest under a gift of life estate to Alexander or to Eleanor, nor under a gift of income, or of *corpus,* to Eleanor's children. On the other hand, they are expressly designated as beneficiaries in a gift of income and a gift of *corpus* (of Alexander's share), and we may also consider the possibility of their taking an interest under the alternate "equitable remainders" in Alexander's and Eleanor's share, and under the power of testamentary appointment given to Eleanor.

The express gifts to complainants are contained in these paragraphs of the codicil (following provisions for the pay-

ment of income to Alexander and Eleanor in varying shares according to certain contingencies) :

> "In the event of the death of my son Alexander his share of my net income shall be used by the trustee of my estate for the education and support of any children he may leave exclusively until he, she, or they arrive at the age of twenty-five years, when the share of my estate from which the said income is derived shall be equally divided among them, or if only one lives, shall be given to that one outright.
>
> "In the event that the children of my son Alexander should die before they attain the age of twenty-five years and none survive, then their shares of my estate shall be given to my heirs of blood."

The rule against perpetuities is in force in this state as a part of the common law. *Hewitt* v. *Green, 77 N. J. Eq. 345* (at *p. 361*) ; *In re Smisson, 79 N. J. Eq. 233* (at *p. 242*); *Camden Safe Deposit Co.* v. *Guerin, 87 N. J. Eq. 72; S. C. on appeal, 89 N. J. Eq. 556; Kates* v. *Walker, 82 N. J. Law 157; Stout* v. *Stout, 44 N. J. Eq. 479.*

That rule requires that all future interests, legal or equitable, in realty (except dower and curtesy and rights of entry for conditions broken) or personalty, which are contingent and indestructible, must be such as necessarily to vest, if at all, within the term measured by the life or lives of a person or persons in being at the time of the creation of the interest and twenty-one years thereafter; otherwise they are invalid and void. *Cf.* generally, *30 Cyc. tit. "Perpetuities."* Professor Gray states the rule in the following form:

> "No interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." *Gray Perp. (3d ed.) 174.*

(To which he adds, of course, that the rule governs both legal and equitable interests in both realty and personalty.)

The question as to whether the alternate gifts of the *corpus* or "equitable remainder in fee" in "Alexander's share" of the estate are to be deemed vested or contingent, has been argued ably and at length, but determination thereof is not essential. As to the gift to those children of Alexander who survive

him and arrive at age twenty-five, the designated class of course includes children (if any) born after testator's death. It is not limited to complainants, but is to "any children he [Alexander] may leave," when they attain age twenty-five. Even if it be considered that complainants would technically take a vested interest either at testator's death or at Alexander's death, subject to divesting by dying younger than twenty-five years of age, I think there can be no doubt that this attempted gift to Alexander's children is void under the rule against perpetuities.

Gifts over to a class, where the class is open until some future time, are technically vested (unless they are made expressly subject to some other contingency), if there be one or more of the class *in esse* at the time of the making of the gift. Nevertheless, from the standpoint of the perpetuity rule, they stand on the same footing as purely contingent gifts, since the final membership of the class, and, hence, the actual ascertainment of the persons who will take, will not be determined until the time fixed for the closing of the class. And when the time fixed for the closing of the class is so remote as to conflict with the perpetuity rule, the gift is void. *Gray Perp.* (*3d ed.*) *87, 88* §§ *110, 110a;* *Foulke Perp. 443, 445* §§ *67, 69.*

In the present instance the time fixed for the closing of the class is when, first, some child of Alexander reaches the age of twenty-five years. Where a gift is made to such children as reach a certain age the class is closed and the maximum number of members thereof ascertained when the first one reaches the specified age. All children born up until then will have the possibility of coming into share, although no particular one of them will in fact share unless he himself attains the age; but a child thereafter born cannot share— he does not have even a contingent interest. *2 Jarm. Wills* (*6th Eng. ed.*) *1677; Gray Perp. 337* § *379; 40 Cyc. 1480; Ward* v. *Tomkins, 30 N. J. Eq. 3.*

Complainants may all die before their father and without reaching twenty-five years of age. Alexander may have other children and may himself die when none of them is more

than three years old, and one or more of them may thereafter reach twenty-five years of age. The class would close at that moment, and that moment is too remote under the perpetuity rule. It is not enough that the contingency *may* happen within the time limited by the rule; it must *necessarily* happen, if it happen at all, within that time. If there be a possibility that it may happen after the time limited by the rule, the gift is void. *Gray Perp. (3d ed.) 185 § 214; Foulke Perp. 194 § 335; Lew. Perp. *170, 171; 30 Cyc. 1483.*

The precise thing that testator has attempted to do in the present case has been frequently used as an illustration of a gift void under the rule against perpetuities:

"Suppose, on the other hand, that land is given to trustees in trust to pay the rents to A. during his life, and on his death to convey the land to such of A.'s children as reach twenty-five. This limitation to the children, being equitable, is not a remainder, and is too remote. For A.'s children may not reach twenty-five until more than twenty-one years after his death." *Gray Perp. (3d ed.) 304, 305.*

"There is often a gift to a class of persons, for example to the grandchildren of a testator, upon a contingency which may happen beyond the limits of the rule against perpetuities; as, for instance, a bequest of money to be divided among those of the testator's grandchildren who reach twenty-five. Such a gift is bad, although the testator has grandchildren living at his death. For although, if the living grandchildren reach twenty-five, they must do so during lives in being at the testator's death, namely, their own lives, yet as they may all die before reaching twenty-five, the class may ultimately be composed of grandchildren not born at the testator's death, and the bequest may therefore vest more than twenty-one years after the end of all lives then in being." *Ibid. 332 § 339.*

"But if there is a limitation to some of the children of A., a living person, as reach twenty-two or any other age over twenty-one, and there is no child of A. alive at the time the limitation is created who has reached that age, then the limitation is bad," &c. *40 Cyc. 1388,* and numerous cases cited. See also *Foulke Perp. 270 § 448; Lew. Perp 455,*

where similar illustrations are used by the authors.

Possibly all of these illustrative examples are derived from the oft-cited case of *Leake* v. *Robinson, 2 Meriv. 363; 35 Eng. Reprint 979,* a case which deserves particular mention here not only because of its unquestioned authority during the

past hundred years, but also because of its peculiar similarity to the case at bar in so many of the various facts and issues involved.   Amongst these points of similarity—there was a gift of realty and personalty to trustees to pay income to one for life, then to his children until they attained twenty-five, then to pay the *corpus* to them, or, if no child attained twenty-five, to pay the *corpus* to the life tenant's brothers and sisters on their attaining twenty-five.   It is held that after-born brothers and sisters are included in the class, that the gift is contingent, and is void for remoteness because of the perpetuity rule.

Finally, there are at least two adjudicated cases in this state where similar attempted gifts have been held void as against the perpetuity rule—*Hewitt* v. *Green, 77 N. J. Eq. 858,* in this court; and *Kates* v. *Walker, 82 N. J. Law 157,* in the supreme court.

Taking up next, the gift over (of the *corpus* of "Alexander's share") to the "heirs of blood"—

"In the event that the children of my son Alexander should die before they attain the age of twenty-five years and none survive, then their shares of my estate shall be given to my heirs of blood."

This gift also seems contingent and void under the perpetuity rule.   For the gift is that *if* all the children of Alexander die before attaining twenty-five years, *"then"* the *corpus "shall be given"* by the trustee to "my heirs of blood." The moment of time to which the word "then" refers, the moment of determination of the contingency, is, of course, that instant when there first comes into existence a situation comprising the following concurrent factors: (*a*) Alexander being dead; (*b*) all of Alexander's children being dead without any such child having attained twenty-five years of age subsequent to Alexander's death.   It is possible, and was possible at testator's death, that that moment may occur more than twenty-one years after Alexander's death. for a child may be born immediately prior to Alexander's death and live to attain twenty-two or more but die before attaining twenty-

five, and all other children may have predeceased him without attaining twenty-five.

On the other hand, even if we accept the supposition or theory that the equitable remainder is vested in the "heirs of blood," complainants take no interest thereby. Whether by "heirs of blood" testator meant his heirs-at-law; whether he meant all next of kin or those of either or only those in whom was the blood of a common ancestor, or the blood of testator himself, if the class so designated, took a vested interest at testator's death and is, therefore, to be determined as of that time, it is perfectly certain that it then consisted of Alexander and Eleanor and no one else, they being his own children and only heirs-at-law and next of kin.

For these same reasons that complainants can take no interest in the alternate gift of the *corpus* of "Alexander's share" to testator's "heirs of blood," they can take no interest in the corresponding gift of "Eleanor's share" to testator's lawful blood heirs. The pertinent language of the codicil is as follows:

"Should my daughter Eleanor remarry and have issue thereby, upon her death the trustee of my estate shall use her share of the net income thereof for the support and education of her child, if only one, or children if more than one. In the event of the death of said child or children subsequent to the death of their mother and before reaching the age of twenty-five years, the portion of my estate from which the income is derived to which under this codicil they are entitled shall be divided among my lawful blood heirs.

"If my daughter Eleanor shall leave child or children and she be dead and the said child or children arrive at the age of twenty-five years, then, that portion of my estate from which her income is derived shall be equally divided among them."

Indeed, the contingent character of the gift to the "lawful blood heirs" is even more clear and obvious from the wording here than in connection with "Alexander's share," for here the gift to the lawful blood heirs is expressed as to take effect only if Eleanor remarry and have issue thereby and such issue all die subsequent to their mother and before reaching age twenty-five. If Eleanor never has issue the "lawful blood heirs" could not take under the words of this paragraph.

Remains to be considered the question of complainants' interest in the income from "Alexander's share," and under the contingent power of testamentary appointment among testator's "blood relations" given to Eleanor. As to the former, it is argued on the authority of *Hewitt* v. *Green, 77 N. J. Eq. 358,* that the entire trust is void; at least as to all interests subsequent to Alexander's life interest. However, the invalidity of an attempted ultimate gift of *corpus* by no means necessarily vitiates the entire trust. The general rule is, I take it, rather the other way. The provisions of the will are to be disturbed no further than is absolutely required by the existence of the rule against perpetuities. *Foulke, supra,* §§ *375, 463; 21 R. C. L.* § *57; 5 Am. & Eng. Ann. Cas. 431.* In this behalf, *Gray (3d ed.)* §§ *249e-249g,* is illuminating and forceful.

Where a gift is made to a trustee to accumulate the income thereof until a certain time and then pay over the *corpus* and accumulated income, if the ultimate gift is invalid the whole trust is held invalid, since the trust to accumulate income, although not in itself void under the perpetuity rule, is merely incidental to and in aid of the ultimate gift; if there had been no such ultimate gift there would have been no direction to accumulate income. *Cf. Hillyard* v. *Miller, 10 Pa. 329; Foulke, supra,* § *462; Gray, supra,* § *671; 30 Cyc. 1498,* and *note 70.* But the situation is very different where the trust is for the purposes of supporting several independent gifts, whether concurrent or consecutive. In such case, unless it be impossible so to do, the several gifts are to be separated and those preserved which do not violate the rule.

Both of these principles are exemplified in the opinion in *Hewitt* v. *Green, supra.* There was in that case a gift to trustees to pay certain annuities and to accumulate the balance of income until testator's youngest grandchild attained twenty-five, at which time the *corpus* was to be given to the grandchildren then living. There was also a provision that if any of the annuitants were then still living, so much of the *corpus* as was necessary to pay their annuities should be retained by the trustees and not paid over until the death of

such annuitants. There was a further provision that each grandchild's "share" of the accumulated income should be paid to him on his attaining twenty-one and that he should thereafter receive the share of accruing income annually. The trust fund was of $100,000 and half the income therefrom would be ample to pay all the annuities. The ultimate gift to the grandchildren was void as against the perpetuity rule and it was held that the provisions as to income, so far as they enured to the benefit of the grandchildren, were merely incidental to the tying up of the *corpus* to the remote period, and so must fail with the gift of *corpus;* but that on the other hand the trust was valid as to the annuities, which were independent gifts and should be preserved, and the *corpus* was divided so that the trustees should retain a sum sufficient to yield income to cover the annuities.

It is to be noted, then, that *Hewitt* v. *Green* holds the gift of income intended to enure to the benefit of the grandchildren, void, *because* under the terms of that will the provisions as to that income were merely incidental to and in aid of the ultimate gift. *Cf. Gray, supra,* § *249h.* The provisions of the present will are quite different. In that will there was no gift to, nor provision for, the beneficiaries, whatever, until the attainment of age twenty-one; during the *interim* the income was to be accumulated. Here the income is to be used for the education and maintenance of the grandchildren, exclusively, from the death of the son, Alexander, until the attainment of age twenty-five, the time fixed for the ultimate gift of *corpus.* Assuredly where a trust is created to provide a life estate to A, and a subsequent life estate to B, and then a remainder to C, the invalidity of the gift to C will not vitiate the prior gifts to A or to B. So, also, if the gift to B were a term for years instead of a life estate. And it can make no difference if the gift following B's life estate or term for years is a contingent remainder to B himself instead of to a third party, C. The gifts are of separate, successive estates. Neither can it make any difference if the third gift, the contingent remainder to B, is intended to cut short the antecedent life estate or term for years—that is to say, it can

make no such difference as to make the antecedent life estate or term for years void; it will of course make this difference, that the contingent remainder being void, the antecedent life estate or term for years will not be cut short thereby (unless it clearly appears by the will that testator intended that the occurrence of the contingency which was to be the commencement of the remainder should operate to terminate the preceding estate irrespective of whether or not the remainder was valid).

It seems clear that that is precisely the situation under this will. The trust is to Alexander for life; next (considering it from the standpoint of a single child), to his child, until he attain twenty-five years, or die earlier; remainder to the child if and when he attains twenty-five, otherwise remainder at his death to the testator's "heirs of blood." The gift to each child (preceding the alternate remainders) is either a life estate, subject to being cut short by his reaching the age of twenty-five, and the concurrent (intended) vesting and commencement of the remainder in him, or else it is a term for years (*i. e.*, for so many years as must elapse until he can attain age twenty-five), subject to being cut short by his earlier death and the concurrent (intended) commencement of the remainder in the "heirs of blood."

In my opinion the gift of income to the children of Alexander is entirely separate from and independent of the (attempted) alternate gifts of the *corpus* and is therefore not vitiated by the invalidity of the latter, unless the will clearly shows such to be testator's intention; and no such intention is to be discerned in this will, but rather the contrary. Of course, consideration as to what is shown by testator's will as to his intention in the event of a provision being declared invalid, is largely speculative where, as here, there is no expression relative to such a contingency and it is evident that testator in all probability never contemplated the possibility of such contingency. But this will does show an intent to benefit Alexander's children by a prior estate terminable at their death or on reaching age twenty-five; and in the latter event terminable not by a cessation or diminution of their

interest, but by an increase thereof; and in the former event (which, of course, precludes further enjoyment by these beneficiaries for whom he sought to provide), terminable not in favor of any other particular person or persons, but in favor of (as a sort of last resort) testator's "heirs of blood," a class of beneficiaries apparently rather vague and indeterminate in testator's mind, and especially so if (as is my view) the ascertainment of that class was to be determined as of the date of the contingency upon which the "heirs of blood" were to take or enjoy.

It is true that there are more than a few authorities (such as *Re Johnston's Estate, 185 Pa. St. 179; 'Gerber's Estate, 196 Pa. St. 366; Kountz's Estate, 213 Pa. St. 390,* and a number of decisions in Illinois and New York) holding that where a trust is created with an ultimate gift of *corpus* thereunder and prior estates for years or lives, if the ultimate gift be too remote and hence invalid, the prior estates are invalid also, on the theory that it is to be *conclusively* presumed the ultimate gift was testator's main purpose or object and the prior estates merely incidental; and these authorities are reflected in some of the text books or the text of some of the digest writers. Such a holding is, however, utterly opposed to the rationale of the matter and the weight of authority is overwhelmingly the other way, as is also the decision in *Stout v. Stout, 44 N. J. Eq. 479.*

Since this opinion was written the opinion in *Graves* v. *Graves, 1 N. J. Adv. R. 252 (94 N. J. Eq. 468),* has been published. It is an authority, in addition to those hereinbefore cited, for the proposition that the rule against perpetuities is in force in this state as a part of the common law, and also in support of the determination herein that the attempted alternate gifts of *corpus* are void as contravening the perpetuity rule. It is also to be considered in relation to the question of the validity of the gifts preceding the invalid gifts of *corpus.*

In that case the ultimate gift of *corpus* was to testator's great grandchildren, and there were preceding gifts of income among testator's children and grandchildren, in varying

shares according to varying circumstances, and an annuity to his widow (the several trusts are set forth on page 254 of the opinion). It is held, of course, that the gift of *corpus* is void, as being too remote. It is also held that testator's next of kin are entitled to immediate distribution of the *corpus,* except so much thereof as is required for the widow's annuity (just as in *Hewitt* v. *Green, supra,* the residuary legatees were held entitled to the *corpus* except the amount necessary to pay the annuities). It necessarily follows, therefore, that the prior life estates to the children and grandchildren were deemed void, although the opinion does not specifically state the ground therefor.

A careful reading of the opinion, and reference to the record in the cause, render it evident, I think, that the basis for the determination in this behalf must necessarily have been (as in *Hewitt* v. *Green, supra*), that prior gifts which are only incidental to the effectuation of a main purpose which is void, fall with the main gift; and that none of the prior life estates were separable from the void remainder in fee and the life estates which were merely incidental thereto; and that it was impossible under the provisions of the will to separate testator's intent and purpose as to gifts which were void and those which (if they could be separated) would not be void.

In the fourth clause of the will (not quoted in the opinion) testator expressly and specifically states his intent and purpose that the principal of his estate should remain intact (tied up) "for the benefit of my grandchildren *and* their families, and *to that end"* he gives the estate to the trustees with the subsequent provisions as to its disposition by them as to income and principal. By the "families" of his grandchildren he meant, it is clear, his great grandchildren.

In *Hewitt* v. *Green* the provisions of the will were interpreted as meaning that testator's main purpose was to tie up the principal until a time which was too remote. In this case interpretation is unnecessary—testator expressly says his main object is to tie up the estate for (*inter alia*) the benefit of his great grandchildren until a time which is too

43

remote. It is true he says for the benefit of his grandchildren and his great grandchildren, but his language places them on a parity; there is nothing to indicate that his purpose to benefit grandchildren by income was greater than that to benefit great grandchildren by *corpus*. Hence, it is impossible to separate them, and the gift of income to the grandchildren must be deemed incidental to the intent and attempt to accomplish the invalid main purpose and to fall therewith.

I think it is apparent, from what is said by the chancellor on page 259 of the opinion, that this is what led him to the determination of the invalidity of the prior gifts (except the widow's annuity, as to which testator's intent and purpose was of course clearly separable), although he does not so state in terms.

The instant case is therefore just as different from the *Graves Case* as from *Hewilt* v. *Green*. For it was not Dr. McGill's intent, either in express words or by the interpretation of his will, that the contingently terminable life estate to Alexander's children was merely incidental to the main purpose of tying up the estate until a time too remote. As I have hereinbefore explained, in my view, it is apparent from the whole of the testamentary provisions and from his surrounding circumstances that his main intent was not the tying up of the estate, but to benefit Alexander's children; to benefit them at least by a life estate even if they should not receive the *corpus;* the postponement of the *corpus* till they attained age twenty-five was not the main purpose, but the incidental one; the particular means by which, in his judgment, they would best receive and enjoy the benefit to them which it was his main purpose to bestow.

· The test is, as always, testator's intent. In the *Graves Case* testator himself expressed his main purpose and intent as being to accomplish an illegality—the tying up of the estate for the benefit of great grandchildren. In this case it is to my mind impossible to conclude otherwise than that Dr. McGill's main purpose and intent (aside from the benefit to

Alexander himself) was to benefit Alexander's children by the income for their lives.

The particular phraseology used by testator in the two quoted paragraphs of the codicil dealing with "Alexander's share," differs somewhat from the phraseology of the two corresponding paragraphs dealing with "Eleanor's share," but, I think, it is evident that testator's design and intent with regard to each of the two shares was essentially identical—except for the additional restriction as to "Eleanor's share" that her children are to be by a husband other than Carr. There was this difference in actual fact—that Alexander had children living at testator's death and Eleanor did not; yet the language of the gift of income to them after Eleanor's death more clearly expresses a life estate and is more absolute in form than the corresponding provisions as to "Alexander's share." I am satisfied, therefore, that under the true interpretation and meaning of testator's will, considered as a whole and in the light of his surrounding circumstances (*Cf. Torrey* v. *Torrey, 70 N. J. Law 673,* and *Coyle* v. *Donaldson, 91 N. J. Eq. 138*), testator by this gift of income to Alexander's children gave to them an equitable life estate, commencing at Alexander's death and subject to being terminated prior to the end of their lives, by the taking effect of the gift of *corpus* on the attainment of age twenty-five. This latter gift being invalid, there is nothing to cut short the life estate. The situation in this respect is analogous to that in *Drummond* v. *Drummond, 26 N. J. Eq. 234,* where a gift of absolute ownership was followed by an executory devise to another on a certain contingency. The latter beneficiary predeceased testator, and the executory devise thus failing, the original gift was freed from the possibility of divestiture on the happening of the contingency. *Cf.,* also, *Brazzalle* v. *Diehm, 86 N. J. Law 276,* and *Trenton Trust Co.* v. *Moore, 83 N. J. Eq. 584; affirmed, 84 N. J. Eq. 194.*

This equitable life estate is as to complainants, doubtless vested, subject to divesting in whole or in part by their predeceasing Alexander or by the birth of other children to

Alexander. *Vide supra* as to gifts over to a class determinable at a future date.

I think also that it is comprehensive of the entire income. The language is that after Alexander's death "his share of my net income shall be used by the trustee of my estate for the education and support of any children he may leave exclusively," &c. It is the entire income (Alexander's share)—not a part of it—not such part of it as may be necessary or reasonable; or as shall be suitable and proper; nor in the trustee's discretion. There is no discretion given to the trustee; neither is there any provision to accumulate or for any other disposition of any unused portion. There is nothing to indicate that testator intended or contemplated that there would, or might, be any unused portion; on the contrary, the language indicates just the reverse. It *"shall* be used" for the education and support of the children *"exclusively."* Corresponding language is used in the corresponding provision as to Eleanor's share—except that there the word "exclusively" is not used. If this difference has any significance, it, of course, emphasizes, rather than detracts from, the interpretation above mentioned as to Alexander's share.

The language of this gift to Alexander's children differs, it is true, from the language of the gift of income to Alexander and Eleanor, which is, that "the net income  *  *  *  shall be *paid* to my children," &c. It is but natural, however, that testator should not direct that the income be *paid* to the grandchildren—because some or all of them might be infants, and of very tender years; as, indeed, they were at the time of the execution of this codicil, and are now.

Each case, of course, turns upon the particular language, testamentary scheme and provisions, and circumstances, so that precedent is rare. There are but few cases in this state dealing with the point, and those which I have examined deal with language and circumstances different from those here present. *Soames* v. *Martin, 10 Sim. (Eng.) 287,* however, seems to be squarely on all fours. There testator directed the income "to be applied for the maintenance and education" of his nephew (then an infant). Vice-Chancellor Shadwell

held the nephew was entitled to the income for life. This was approved and followed by Vice-Chancellor Hall in *Wilkins* v. *Jodrell, 13 Ch. Div. 564.* The addition of the word "exclusively" makes the case *sub judice* even stronger.

The only gift in the codicil remaining unconsidered, is the power of testamentary appointment.

"My daughter Eleanor shall have the privilege to bequeath at her death, in the event that she die without lawful issue, the share of my estate from which her income is derived to any of my blood relations she may select—but my preference is that my estate go to my immediate descendants."

That complainants have a contingent interest thereunder, as being members both of the class of testator's "blood relations" and of the more limited class of his "immediate descendants," is clear, if the provision be valid; and I think it is. It is argued against the validity of this provision, that it is so bound up with the void gift of *corpus* as to be inseparable therefrom, and hence to fall with it. I think the converse is clear. By Eleanor's dying "without lawful issue" testator meant "without leaving issue her surviving," not "without ever having had issue." The prior portions of the codicil show that what he had in mind was whether or not she would leave children at her death. If she did, he provided gifts of the income and of principal to them. If she did not, the share was to go to testator's "lawful blood heirs," with, however, an alternate or substitute provision that Eleanor may pick out one or more of the blood heirs or relations instead of having the estate go to them all as a class. Why he made no similar provision as to Alexander's share, we can only conjecture, but it is immaterial. Possibly, since Alexander already had children, he thought the contingency in his case too improbable to provide for.

As already noted, where one provision of a will is held invalid or void, the other provisions are to be disturbed thereby only where it is necessary. The power of appointment must needs be exercised at Eleanor's death, and, therefore, the gifts under it, if it be exercised, do not contravene the per-

petuity rule. The gift of the power of appointment is not inseparable from the invalid alternate gift of *corpus*. It is not to operate at all, if she leave children her surviving; if she leaves no children her surviving, it is expressly put in as a substitute for the gift over to the "blood heirs;" the gift to them was intended to take effect only if Eleanor failed, or did not care, to exercise the power. The argument which is made that testator did not intend that there should be such an unequal division of the *corpus* as between Alexander and Eleanor as might possibly result from the exercise of this power is utterly without force—for Alexander and Eleanor take the *corpus* not by virtue of what testator provided, but because of the invalidity of what he did provide and his failure to provide for the contingency of such invalidity. If the gifts over had not been invalid, there are only two possibilities; either he never contemplated that Alexander or Eleanor should ever take any part of the *corpus* (in which case the argument has no foundation at all) or he contemplated that one or the other might take, as blood heir, all or part of the other's share. If the latter, Alexander could, as blood heir, take only Eleanor's share, and he expressly gives Eleanor, by this power of appointment, the ability to prevent that, if she so desires.

On this branch of the case I conclude that complainants have a vested equitable life estate in "Eleanor's share," subject to Eleanor's life estate therein, and subject to defeasance by predeceasing Eleanor; and that they have a contingent interest, under the contingent power of testamentary appointment given to Eleanor.

Complainants, therefore, have the right to file their bill, or rather to have it filed in their name. They would have such right even if their interest in the income were held contingent instead of vested—for the possibility of their actual taking and enjoyment cannot be said to be so remote as to lead a court of equity to deny them the right to protect it. *Perry Trusts* § 275, and cases cited; also in cases in *Note, 7 L. R. A. (N. S.) 1000.*

## II. HAVE ALEXANDER AND ELEANOR VESTED ESTATES IN REMAINDER IN THE CORPUS?

I think they have, or at least, what is equivalent thereto. The estates are equitable, the legal title being in the trustee. As to "Alexander's share," there is an equitable life estate in Alexander, followed by an equitable life estate in his children, an estate for their joint lives, vested as to his present children, contingent as to possible future children. On the death of the survivor of them, or on Alexander's death, if he leave no children him surviving, what then? The attempted gift of *corpus* is invalid. The trustee has no beneficial interest. Clearly, there is a resulting trust, corresponding to intestacy if the estates were legal instead of equitable, in favor of testator's heirs-at-law and next of kin, at·the time of his death, to wit, Alexander and Eleanor. They are now vested of this equitable remainder in the *corpus* of Alexander's share. Their interests therein are of course several, not joint, corresponding to the legal estates by intestacy under the statutes of descent and distribution. They are subject, of course, to Alexander's life estate and the succeeding life estate in his children.

As to "Eleanor's share," they (Alexander and Eleanor) are likewise severally vested of equal undivided shares by way of equitable remainder—subject, however, in this instance, to Eleanor's life estate (which is subject to being cut down to an annuity of twelve hundred dollars in the highly improbable, but still possible, event of a remarriage to Carr after divorce from, or death of, her present husband) ; next to a succeeding contingent, instead of vested, life estate in possible children of Eleanor by any other husband than Carr; and subject to possible defeasance by the contingent exercise of a contingent power of testamentary appointment by Eleanor.

### III. ARE ALEXANDER AND ELEANOR ENTITLED TO IMMEDIATE POSSESSION OF THE CORPUS?

It is evident from what has already been said, that they are not so entitled. As to "Alexander's share," their right to enjoyment of *full* ownership *in præsenti* by merger of their respective several life estates in one-half the principal with their several half interests in remainder, is postponed by the interposition of the life estate to Alexander's children; as to "Eleanor's share," it is postponed by the interposition of the contingent life estate to her possible children, assuming that the also intervening contingent power of appointment could be gotten rid of by renunciation by Eleanor. There is also the further feature that Eleanor's own life estate in the one-half the *corpus* is subject to reduction to an annuity of twelve hundred dollars under the contingency of her still possible future remarriage to Carr. In this connection, it is at least interesting to note the doubt as to what is to become of the balance (over and above twelve hundred dollars) of the income from "Eleanor's share," if the contingency just mentioned should occur. The contingency is so remote, however, that it is unnecessary to pursue the inquiry at this time.

\*       \*       \*       \*       \*       \*

This, then, disposes of the questions arising under the first cause of action in the counter-claim of Mrs. Mayer; and the issues so involved being separable and distinct from the other issues in the suit, a final decree therein may properly be entered forthwith, instead of awaiting the result of the consideration of the remaining issues. Such a course, while perhaps unusual, is, I think, in accordance with chancery rule 15 (*d*); certainly it is within the spirit and reason of that rule. It is advisable in the present case, since an appeal has been taken in the *Graves Case* (*supra*), and should any of the parties desire an appeal in this case, on the phases thus far discussed, it may be brought on at the coming term and the two cases involving the same or similar principles may both be before the appellate court for consideration at the same time.